*871 OPINION OF THE COURT
Edward H. Lehner, J.
This is an action by a joint venture of construction and real estate interests seeking $800 million in damages from the City of New York (the City) for the alleged breach of designation agreements whereby plaintiff was granted the exclusive right to negotiate for the development rights to certain lower Manhattan property. The City moves for summary judgment dismissing the complaint.
FACTS
The Washington Street Urban Renewal Area (WSURA) consists of 38.4 acres of City-owned land in the Tribeca section of lower Manhattan. Pursuant to a request for proposals, plaintiff was designated by letters of the City’s Department of Housing Preservation and Development (HPD) dated January 29, 1982 and February 1, 1982 to "exclusively negotiate with the City” for a 90-day period (which the City could extend under certain conditions) the terms of a land disposition agreement (LDA), i.e., the development rights, for sites 5B and 5C of WSURA, an area of approximately four acres. The letters also provided that "the City retains the right to terminate negotiations at any time.”
The rights of the parties were further specified by letters dated June 2, 1982, which provided that during the exclusive negotiation period and any extensions thereof plaintiff would "continue to develop at [its] sole risk, cost and expense, building designs, marketing concepts, massing studies and financial projections”, and after the form and substance of an LDA has been agreed upon would "at [its] sole cost and expense * * * fully and expeditiously cooperate with HPD in meeting the Legal Requirements”, which included compliance with the uniform land use review procedure under section 197-c of the New York City Charter and submission to the Board of Estimate for its approval. The June agreements also required plaintiff to maintain the Washington Market Park for public use, at its sole cost and expense.
By letter dated November 29, 1983 plaintiff’s designation as developer of the sites was terminated, despite the absence of any fault on its part, because of the decision that "it is in the best interest of the City to reserve [the sites] for commercial development by back office users, many of whom wish to construct their own buildings.”
*872 The first cause of action alleges that the City breached "the designation agreements and the obligation of good faith and cooperation implicit therein”. For said breach plaintiff seeks $500 million, representing its expenses as well as "the amount attributable to the loss of the sites”.
The second cause of action alleges that plaintiff had negotiated the essential terms of a lease with Shearson/American Express, Inc. (Shearson) for commercial premises to be built on site 5B, in connection with which defendant’s representatives had indicated that a tax abatement would be forthcoming, only to have defendant reverse itself and then separately negotiate with Shearson for the purchase of other sites within WSURA for which tax abatements and other incentives were then granted. Plaintiff seeks $100 million for the alleged breach, representing its expenses as well as the amount attributable "to the loss of the transaction with Shearson”.
In its third cause of action plaintiff seeks $100 million for tortious interference with its precontractual relations with Shearson, claiming that the agreement with Shearson was complete as to its essential terms and would have been consummated but for the wrongful actions of defendant.
In its fourth cause of action plaintiff seeks $100 million for breach of the letter agreements by reason of defendant’s negotiation with Merrill Lynch & Company for the sale and development of the sites during the exclusive negotiation period.
PRIOR PROCEEDINGS
The dispute between the parties has already twice been before the Court of Appeals.
A City motion to dismiss the first two causes of action pursuant to CPLR 3211 (a) (7) was denied (111 AD2d 49 [1985], affd 67 NY2d 990 [1986] [two Judges dissenting]).
Contemporaneous with the institution of this action, plaintiff commenced a CPLR article 78 proceeding against HPD to have the de-designation declared arbitrary and capricious. In affirming the dismissal of that proceeding, the Court of Appeals, in its memorandum opinion (Matter of Goodstein Constr. Corp. v Gleidman, 69 NY2d 930, 931 [1987]), said: "We agree with the reasoning of the Appellate Division that while certain of the alleged conduct may, as we have held (see, Goodstein Constr. Corp. v City of New York, 67 NY2d 990) give *873 rise to a breach of contract action, such allegations do not simultaneously provide a clear legal right to article 78 relief.”
In his plurality opinion in the Appellate Division, in which the facts herein are set forth in detail, Justice Sandler stated: "The stated reason for de-designating petitioner-respondent as developer of the two sites was a governmental decision to change the land uses of the vacant city sites in question from those originally intended at the time petitioner-respondent was designated as a developer, and a further decision that the development of the areas in question in accordance with the revised land uses made desirable a different procedure for conveying the sites. We perceive no factual basis in the record for petitioner’s claim that these governmental decisions affecting the use of city-owned lands were arbitrary or capricious. Nor do we perceive any factual basis for the claim that these decisions did not represent a good-faith judgment reached by the responsible governmental officials in what they believed to be the best interest of the City.” (117 AD2d 170, 171-172 [Sandier, J., concurring].)
However, although finding the lack of any "factual basis” to conclude that the de-designation decision "did not represent a good-faith judgment by the responsible governmental officials”, Justice Sandler, in referring to the prior Appellate Division decision finding that the first two causes of action of the complaint herein stated viable causes of action, noted: "the issue of good faith presented in a contract action is distinct from the issue of good faith when it is sought to be raised in an article 78 proceeding.” (Supra, at 177 [Sandier, J., concurring].)
CONTENTIONS OF THE PARTIES
With respect to the first cause of action, the City contends that since it believed that the letter agreements were not binding contracts, being merely unenforceable "agreements to agree”, it could not have acted with the scienter necessary to constitute bad faith.
It is asserted that the Board of Estimate resolutions approving both the disposition to Shearson and the sixth amended plan for WSURA demonstrate that the change in policy with regard to land dispositions was arrived at and implemented in the City’s best interest. Thus, it is argued, where the relevant decisions were guided by any legitimate purpose, bad faith cannot be shown, and there is nothing in the record "which *874 even suggests that the City acted with the 'dishonest purpose’ or 'sinister intentions’ that must be proven in a bad faith claim”.
Moreover, it is the City’s position that even if plaintiff could establish that a bad-faith breach had occurred, lost profits would not be recoverable since there was no guarantee that the Board of Estimate would approve of the project, and further that the damages sought were not within the contemplation of the parties to the agreement, which bound them to negotiate, but to do no more.
As to that portion of the first cause of action which seeks to recover out-of-pocket expenses, the City contends that such recovery is barred by reason of the "sole risk, cost and expense” clauses in the designation letters. The City maintains that, even in the absence of the exculpatory language, such expenses are a nonrecoverable cost of doing business assumed by participants in the real estate development field.
Plaintiff argues that its de-designation resulted, not from a good-faith change in public policy effected to keep back office operations in the City by sole source selection of "end users” to develop the sites, but from the desire of one or more public officials, armed with the discretion of office, to improperly confer benefits upon others at plaintiff’s expense. The City’s motive in effecting the policy change is thus said to be an issue of fact.
Furthermore, plaintiff contends that discovery previously ordered by this court remains outstanding, the further depositions of the Mayor and other City officials having been stayed by the tactical interposition of this motion for summary judgment. Without said discovery, it is claimed, sufficient opposition to the instant motion cannot be set forth.
With respect to the second cause of action, the City maintains that (i) lost profits from the deal with Shearson are not recoverable because, as with the first cause of action, there was no guarantee of Board of Estimate approval of the LDAs, so that said profits were not within the reasonable contemplation of the parties; (ii) its actions were not taken in bad faith; and (iii) tax abatements could not have been given to plaintiff since no application for them had been made. Plaintiff’s arguments in this regard essentially mirror those made with respect to its first cause of action.
The sufficiency of the third and fourth causes of action was not previously raised. With respect to plaintiff’s claim that the *875 City interfered in its precontractual relations with Shearson, the City argues that several steps remained to be done as part of the corporate "institutional process”, such as legal and administrative review and approval by key Shearson officers and its board of directors, and therefore it is uncertain whether Shearson would have entered into the contract but for the City’s action. Plaintiff, on the other hand, asserts that its negotiations with Shearson were at a very advanced stage.
LOSS OF PROFITS
Of the $800 million in damages sought by plaintiff herein, all but approximately $1 million (which are claimed out-of-pocket expenses) represents a claim of lost profits.
Initially the court observes that since the proposed sales price for the subject property was approximately $28 million, the mere claim that almost $800 million of profits was lost because plaintiff did not obtain the property demonstrates the huge stakes involved in City land use decisions, and underscores the value of campaign financing laws that reduce the influence of contributors.
On the claim of lost profits, even if plaintiff could establish that the City acted in bad faith in negotiating with and subsequently de-designating plaintiff, the claim would be speculative and cannot be sustained because it can never be determined whether the Board of Estimate, an independent body of City government, would have approved an agreement even if one was successfully negotiated by plaintiff and HPD, and all other conditions had been satisfied. Thus, in its decision sustaining the first two causes of action, the Court of Appeals observed: "It is doubtful that plaintiff can establish a right to recover damages resulting from defendant’s failure to sell the sites or to approve an LDA since no agency with the authority to act on behalf of the city in doing so was bound by the designation agreement.” (67 NY2d, supra, at 992; see also, Walentas v Lipper, 862 F2d 414, 419-420 [2d Cir 1988], cert denied — US —, 109 S Ct 1747.)
The eminent legal scholar Professor E. Allan Farnsworth, in an exhaustive article (Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations, 87 Colum L Rev 217, 263 [1987]), stated the following on this issue: "Under an agreement to negotiate, the parties negotiate with the knowledge that if they fail to reach ultimate agreement they will not be bound. The parties to an agreement to *876 negotiate do, however, undertake a general obligation of fair dealings in their negotiations * * *. What is the remedy for breach of such an obligation? The situation here differs from that under the regimes of ultimate agreement and agreement with open terms. There, the obligation of fair dealing is but one obligation that is part of a larger agreement, so that a breach of that obligation might, in an extreme case, be treated as a total breach of that agreement with a resulting claim to damages based on lost expectation. Here, there is no larger agreement and so no possibility of a claim for lost expectations under such an agreement. Furthermore, here there is no way of knowing what the terms of the ultimate agreement would have been, or even whether the parties would have arrived at an ultimate agreement, so there is no possibility of a claim for lost expectation under such an agreement.” The author concludes that for breach of the covenant to fairly negotiate "the appropriate remedy is not damages for the injured party’s lost expectation under the prospective ultimate agreement but damages caused by the injured party’s reliance on the agreement to negotiate” (op. cit., at 267), which here would be limited to the out-of-pocket expenses.
In the recent case of Arcadian Phosphates v Arcadian Corp. (884 F2d 69, 74, n 2 [2d Cir]), the court noted that a party’s "alleged failure to bargain in good faith is not a but-for cause of [plaintiff’s] lost profits, since even with the best faith on both sides the deal might not have been closed [and] attributing [plaintiff’s] lost profits to [defendant’s] bad faith may be speculative at best”. The Circuit Court indicated that out-of-pocket expenses would be appropriate if bad faith in negotiating were established, and distinguished a "substantive obligation” to complete formal contract documents after negotiation, with a breach of the obligation to bargain in good faith, which was intended to begin immediately. (See also, Sardella Constr. Co. v Braintree Horn. Auth., 3 Mass App Ct 326, 329 NE2d 762, 765-766 [1975] [recovery limited to bid preparation costs]; Swinerton & Walberg Co. v City of Inglewood-Los Angeles County Civic Center Auth., 40 Cal App 3d 98, 114 Cal Rptr 834, 838 [1974] [same, on theory of promissory estoppel]; Heyer Prods. Co. v United States, 140 F Supp 409, 413-414 [Ct Cl 1956].)
Since the viability of all damage claims (tort and contract) asserted in the complaint, other than for reimbursement for out-of-pocket expenses, is contingent on an LDA having been consummated between HPD and plaintiff and then approved *877 by the necessary agencies (including the Board of Estimate), and since there is no way of knowing whether such agreement would be concluded and such approvals obtained, all causes of action are dismissed except to the extent they seek such reimbursement.
REIMBURSEMENT OF EXPENSES
Although the June letter agreements provided that plaintiffs efforts in connection with the negotiation for an LDA would be at its " 'sole risk, cost and expense’ ” (not an unreasonable term considering the profits that plaintiff indicates could be earned upon acquiring the property), the Court of Appeals has noted that plaintiff "did not assume the risk of bad faith by defendant”. (67 NY2d, supra, at 992.)
The issue thus presented is whether plaintiff has set forth facts to be entitled to a trial on the claim that the City breached its obligation to act in good faith in the negotiations. In commenting on this obligation, Professor Farnsworth noted in his aforementioned article: "Fair dealing has one meaning where negotiations have resulted in an agreement and an aggrieved party seeks to avoid that agreement for unfairness. Here the claim of unfairness goes to the means used to induce agreement. Judicial experience in dealing with unfairness in this context goes back to the earliest claims of fraud and duress. Fair dealing has a quite different meaning where negotiations have failed to result in an agreement and an aggrieved party seeks to recover reliance damages. Here the claim of unfairness goes to the means used to obstruct agreement. Courts have paid little attention to the meaning of fair dealing in this context. Those that have held that the parties can impose a duty to negotiate on themselves have often * * * left the meaning of fair dealing for a lower court to determine at a subsequent trial. Scholars, too, have been more concerned with the imposition of the duty than with its content”. (Op. cit., at 269.)
Professor Summers, writing in 54 Virginia Law Review 195, 196 ("Good Faith” in General Contract Law and the Sales Provisions of the Uniform Commercial Code), states: "good faith, as used in the case law, is best understood as an 'excluder’ — it is a phrase which has no general meaning or meanings of its own, but which serves to exclude many *878 heterogeneous forms of bad faith”. However, in the 1989 Supplement to Corbin on Contracts, the writer says that such "view is mistaken”, and that "[g]ood faith in contracting is the obligation to preserve the spirit of the bargain rather than the letter, the adherence to substance rather than form”. (§ 654A.)
Here, although the Appellate Division dismissed the article 78 proceeding, the standard as stated by Justice Sandler (117 AD2d, supra, at 176 [concurring opn]) in "deciding a claim that a governmental action was arbitrary or capricious is 'whether there is a rational basis’ for the challenged action.” He then noted that in Rochester Park v City of Rochester (38 Misc 2d 714 [Sup Ct, Monroe County 1963], affd 19 AD2d 776 [4th Dept 1963] [the case primarily relied upon in the decision denying the application to dismiss the first two causes of action]), the court was not presented with the issue of whether the government officials "did not act in accordance with an honest judgment as to that which would best serve the interests of the city, the only relevant issue in a challenge to the good faith of a governmental decision in an article 78 proceeding” (117 AD2d, supra, at 177 [concurring opn]).
Thus, although in the article 78 proceeding it was determined that there was no proof that the decision to de-designote was based on any factor other than an honest decision as to what would best serve the interests of the City of New York, this does not mean that in negotiating the LDA the City did not breach its obligation to fairly deal with plaintiff, Justice Sandler noting that "most of the allegations relied on are not addressed to the issue of good faith” as applicable to an article 78 proceeding (supra, at 178 [concurring opn]). He specifically observed that although the claim that the City was negotiating with Merrill Lynch & Company during the period it had agreed to exclusively negotiate with plaintiff may be pertinent to the contract action, it was not relevant to the article 78 proceeding (supra, at 180 [concurring opn]).
On this type of motion the function of the court is to determine whether factual issues exist — not to determine them. Here the allegations in the affidavits with respect to the nature and extent of the contacts the City had with Shearson and Merrill Lynch & Company relating to the subject property during the period in which the City was to negotiate exclusively with plaintiff are alone sufficient to raise triable issues as to whether the City breached its obligations under *879 the designation agreement. Hence, its motion for summary-judgment is denied solely to the extent that the complaint seeks the recovery of plaintiffs out-of-pocket expenditures incurred in connection with the designation agreements.