VALIHURA, Justice,
concurring in part and dissenting in part:
I concur with the Majority in part, and respectfully dissent in part.
I agree with the Majority’s conclusion that the Court of Chancery’s 2011 finding that expectation damages were “speculative and too uncertain, contingent, and conjectural”[1] is not the law of the case. Rather, as the Majority says, pursuant to our decision in SIGA I, the trial court was free to reconsider a damages award.[2] However, this Court also stated clearly in SIGA I that expectation damages must be proven with reasonable certainty.[3] No recovery can be had for damages that are “uncertain, contingent, conjectural, or speculative.”[4] While it is not the law of the case,- the Court of Chancery’s reversal of its earlier finding that expectation damages here .are “speculative and too uncertain, contingent, and conjectural,”[5] after examining essentially the same information as it had in 2011,[6] is the prqduct of certain legal errors which, in turn, are perhaps the result of the remand instructions from this Court in SIGA I.[7]
As a preliminary matter, the Majority asserts that our scope of review of a damages award is “limited” and that “[d]am-ages awards are reviewed for abuse of discretion.”[8] However, our review of em *1140 bedded legal issues is de novo.[9] I disagree with the Majority’s articulation of the standard of proof required for an award of expectation damages, its approval of the trial court’s consideration of post-breach evidence, and its application of the-“wrongdoer rule” to lessen the quantum of proof to the point of speculation and to broadly attribute to SIGA uncertainties in damages as the “but for” cause for failure to consummate a license agreement. Accordingly, I would reverse the trial court’s decision, and I respectfully dissent as to those aspects of the Majority’s Opinion.
I. THE LAW OF EXPECTATION DAMAGES
Ordinarily, expectation damages are not awarded for the breach of a preliminary agreement due to difficulties in establishing such damages with sufficient certainty. As this Court acknowledged in SIGA I, “[n]o recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative.”[10] The award of lump sum expectation damages in-this case violates that basic principle — as the trial court correctly determined in the. first instance. A féview of the development of the law in the area of preliminary agreements provides a useful analytical backdrop for explaining why damages for breach of preliminary agreements are typically limited to reliance damages.[11]

A. New York Develops a Conceptual Framework Regarding Preliminary Agreements

In 1987, Judge Leval of the United States District Court for the Southern District of New York observed in Teachers Insurance & Annuity Association of America v. Tribune Co., that “[preliminary contracts with binding force can be of at least two distinct types.”[12] He explained that one type “occurs when the parties have reached complete agreement (including, the agreement to be bound) on all the issues perceived to require negotiation.”[13] The second “expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated.” [14]
Two years later, in Arcadian Phosphates, Inc. v. Arcadian Corp.,[15] the United States Court of Appeals for the Second Circuit adopted Judge Leval’s bifurcated framework for analyzing preliminary agreements.. The Second Circuit has since applied this dual construction, observing that “binding preliminary agreements fall into one of two categories[,]”[16] either a *1141 Type I preliminary agreement or a Type II preliminary agreement.
As explained by the Second Circuit Court of Appeals, a Type I preliminary agreement exists “where all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities.”[17] Instruments of this type are “preliminary only in form,” such that the parties only desire “a more elaborate formalization of the agreement. The second stage is not necessary; 'it is merely considered desirable.”[18] Stated otherwise, Type I preliminary agreements are “fully binding,” and are “created when the parties agree on all the points that require negotiation (including whether to be bound) but agree to memorialize their agreement in a more formal document.”[19] Type I agreements “render the parties fully bound to carry out the terms of the agreement even if the formal instrument is never executed.”[20]
Type II preliminary agreements are commitments that are “binding only to a certain degree,” as parties to such instruments “agree on certain major terms, but leave other terms open for further negotiation.”[21] In other words, a Type II preliminary' agreement is “a contract ‘that expresses mutual commitment to a contract’ ” on certain agreed terms, with others to be negotiated.[22]' In the context of a Type II preliminary agreement, the parties “recognize the existence of open terms, even major ones, but, having agreed on certain important terms, agree to bind themselves to negotiate in good faith, to work out the terms remaining open.”[23] However, Type II preliminary agreements “do[ ] not commit the parties to their ultimate contractual, objective but rather to the obligation to-negotiate the open issues in good faith in an attempt to reach the ... objective within the agreed framework.”[24] Therefore, a party to a Type II preliminary agreement “may only demand that [the] counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract.”[25] However, a party to, a Type II preliminary agreement is barred “from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.”[26] *1142 Ultimately, “[i]f the parties ‘fail to reach such a final agreement after making a good faith effort to do so, there is no further obligation.’ ”[27]
This Court first applied New York’s bifurcated approach to preliminary agreements in SIGA I.[28] There, we held that plaintiffs who are party to a Type II preliminary agreement may recover reasonably certain expectation damages if “the trial judge makes a factual finding, supported by the record, that the parties would have reached an agreement but for the' defendant’s bad faith negotiations....”[29] SIGA 1 held that expectation damages are theoretically available, not definitively available, since our acknowl-edgement that a plaintiff might be entitled to recover expectation damages for breach of a Type II preliminary agreement was qualified by the associated footnote, which expressly stated that “[a]n expectation damages award presupposes that the plaintiff can prove damages with reasonable cértainty.”[30] SIGA I, in that respect, does not diverge from bedrock contract law establishing that reasonably certain proof is a predicate to an award of lost profits.[31]
*1143 Notably, the same New York courts that adopted and applied the distinction between Type I and Type II preliminary agreements disfavor awarding expectation damages in cases of a breach of a Type II preliminary agreement.[32] For example, in Goodstein Construction Corporation v. City of New York, a case decided after Judge Leval’s decision in Tribune and the Second Circuit’s adoption of his analytical framework in Arcadian Phosphates, the New York Court of Appeals considered whether a plaintiff could recover damages in the amount of profits it might have earned in the event that- a preliminary agreement to negotiate a final contract evolved into a complete instrument.[33] The court disallowed expectation damages under the circumstances,[34] reasoning that awarding such damages would require it to “transform[] an agreement to negotiate for a contract into the contract itself’ and “give the injured party the benefit of the bargain that was not reached.”[35] Good-stein reflects the general rule that “lost profits are not available where no agreement is reached, out-of-pocket costs incurred in the course of good faith partial performance are appropriate[.]”[36]
•Although some federal cases in New York have awarded expectation damages for breach of preliminary agreements, those cases are distinguishable. In Network Enterprises, Inc. v. APBA Offshore Productions, Inc.[37] for example, the parties entered into a fully enforceable contract for airtime to .present ten telecasts of boat races.’ That contract incorporated an option to renew, which the court characterized as a Type II preliminary agreement to negotiate the “number, dates[,] and times” of the next season’s telecasts in good faith and which contained a “limited” number of open terms.[38] The court, in view of the certainty of the damages calculus and the successful negotiating history between the parties, granted expectation damages by multiplying the fee per telecast set forth in the option by ten, as the option stated that the existing agreement would be renewed under “the same terms and conditions.”[39]
*1144 Similarly, in Teachers Insurance & Annuity Association of America v. Ormesa Geothermal,[40] a borrower breached a commitment agreement it entered into with a lender to obtain a long-term loan. The agreement included “all of the crucial economic terms of the loan,” including the principal, term, interest rate, security, repayment schedule, and penalties.[41] The open terms “were terms that customarily are left for later negotiation” between loan parties.[42] After the borrower breached the commitment agreement by insisting on a lower interest rate, the court awarded expectation damages to the lender in the amount as measured by the difference between the interest income it would have earned had the contract been performed and that it “would be deemed to have earned by timely mitigating its damages— ie., by making an investment with similar characteristics at the time of the breach.”[43]
In Network Enterprisest and Ormesa Geothermal, the terms left open in the preliminary agreements were limited to details of a logistical nature. These agreements allowed the courts to calculate damages based on the terms therein. Here, by contrast,- the terms set forth in the LATS provided a “nuanced, revenue-based approach” to calculating royalties.[44] In addition, other payments would only be made upon the occurrence of certain milestones. A meaningful degree of speculation concerning the success of the project, the occurrence of various contingencies, and the extent of the ensuing profits, if any, would be required to ascertain the extent of PharmAthene’s expectation damages.
In the context of a Type II preliminary agreement, lost profits damages, as a general rule, are inherently speculative. . This case is no exception. Accordingly, I would hold that damages for SIGA’s breach of its obligation to negotiate the license agreement in good faith are limited to Phar-mAthene's reliance damages.
B. The Majority Misapplies SIGA I and Now Places Delaware Out of • Step with Other Major Commercial Jurisdictions
This Court has imported New York’s recognition of the binding force of preliminary agreements without adopting its concomitant limitations on expectation damages. Where parties have not established expectation damages to a reasonable certainty, limiting parties’ damages for breach of a Type II preliminary agreement to reliance damages is necessary to prevent recovery in excess of the reasonable expectations of the parties at the time of breach. The Majority’s decision, allowing non-reliance damages for breach of a Type II preliminary agreement absent sufficient evidence establishing such damages to a reasonable certainty, is a misapplication of SIGA I, which now places Delaware out of step with other important commercial jurisdictions.

i. New York Courts Disfavor Expectation .Damages for Breach of a Preliminary Agreement

As observed above, New York courts have hesitated to award expectation damages for the breach of a preliminary agreement, except in narrow cases where damages are ascertainable with reasonable certainty.[45] In L-7 Designs, Inc. v. Old *1145 Navy, LLC,[46]. the United States Court of Appeals for the Second Circuit, in addressr ing the District Court’s grant of a motion for judgment on the pleadings which rejected a claim for failure to negotiate a licensing agreement in good faith, commented that “[ujnder New York law parties who enter into binding preliminary agreements ... ‘accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement'-..[47] Consistent with the decisions noted above, it then observed that, “[ajlthough lost profits are not available where no agreement is reached ... out-of-pocket costs incurred in the-course of good faith partial performance are appropriate[.]”[48]

it. California Courts Disfavor Expectation Damages for Breach of a Preliminary Agreement

California courts have consistently declined to award expectation damages for the breach of a preliminary agreement.[49] *1146 In Copeland v. Baskin Robbins U.S.A.,[50] the parties entered into a preliminary agreement regarding a Baskin Robbins plant, whereby “Copeland would purchase the plant’s manufacturing assets and sublease the plant property. Baskin Robbins would purchase seven million gallons of ice cream from Copeland over a three year period.”[51] The agreement was contingent upon the ice cream purchase arrangement, referred to as a “co-packing” agreement, which the parties understood to be a material aspect of the deal.[52] “Among the issues to be settled were the price Baskin Robbins would pay for the ice cream, the flavors Copeland would produce, quality standards and controls, who would bear the loss from spoilage, and trademark protection.”[53] However, Baskin Robbins later wrote to Copeland, explaining that ‘“the proposed co-packing arrangement [was] out of alignment with [its] strategy.’ Therefore, Baskin Robbins informed Copeland, ‘we will not be engaging in any'further negotiations of a co-packing arrangement.’ ”[54]
In a suit for breach of contract, Copeland alleged that the preliminary agreement “constituted a contract to negotiate the remaining terms of the co-packing agreement and Baskin Robbins breached this contract by refusing without excuse to continue negotiations or, alternatively, by failing to negotiate in good faith.”[55] The court, however, observed that “[a]rguing bad faith is an uncertain concept which could cost the defendant millions of dollars in expectation damages [and] is also without merit.... [T]he appropriate remedy for breach of a contract to negotiate is not damages for the injured party’s lost expectations under the prospective contract but damages caused by the injured party’s reliance on the agreement to negotiate.”[56] Accordingly, the court held that “damages for breach of a contract to negotiate an agreement are measured by the injury the plaintiff suffered in relying on the defendant to' negotiate in good faith. This measure encompasses the plaintiffs out-of-pocket costs in conducting the negotiations and may or may not include lost opportunity costs. The plaintiff cannot recover for lost expectations (profits) because there is no way of knowing what the ultimate terms of .the agreement would have been or even if there would have, been an ultimate agreement.”[57]
Hi. Other Jurisdictions Disfavor Expectation Damages, Paiiicularly in the ■ Pharmaceutical Context
Particularly in the pharmaceutical context, the courts of other jurisdictions appear to disfavor expectation damages.[58] In AlphaMed Pharmaceuticals Corp. v. *1147 Arriva Pharmaceuticals, Inc.,[59] in the context of a patent infringement suit, the United States District Court for the Southern District of Florida observed that “only a minuscule percentage of drugs in development ever reaches the commercial market — and of those, only a subset ever prove profitable for their manufacturer. Accordingly, reliance on a multitude of assumptions is endemic to any valuation of the prospective profitability of new pharmaceutical products.”[60] In view of the intrinsic unpredictability underlying the development of pharmaceuticals, the District Court noted that “inherent uncertainty makes the recovery of lost profits for anticipated sales of a new drug exceedingly difficult.”[61]
In Microbix Biosystems, Inc. v. BioWhittaker, Inc.,[62] the United States District Court for the District of Maryland, in the antitrust context, found that a plaintiffs request for lost profits related to the production of a pharmaceutical ranging between $60 and $95 million, even before trebling, was too speculative. In so holding, the District Court stated that “for the damages to be of the amount claimed (or any amount for that matter), one must assume that [the plaintiff would have successfully secured a manufacturing facility, obtained FDA approval, developed the [drug’s essential protein enzyme] in commercial quantities, and marketed the product during the relevant time frame.”[63] Because the court concluded that the plaintiff failed to present evidence of damages “with a sufficient degree of certainty,” it granted summary judgment.[64]
Further, this Court has recognized the desirability of maintaining symmetry of laws in important areas.[65] In SIGA I, we acknowledged that there were two enforceable, relevant contracts. We stated that “[t]he promise to negotiate in good faith for a definitive license agreement in accordance with the LATS’s terms [was] expressly included in both the Bridge Loan and Merger Agreements.”[66] The Bridge Loan Agreement was governed by New York law[67] and the Merger Agreement was governed by Delaware law.[68] The asymmetry between New York and Delaware law, now enhanced by the Majority’s Opinion, is undesirable, particularly since it is common for financing agreements to be governed by New York law, and for merger and other related transaction *1148 agreements to be governed by Delaware law.
II. ERRONEOUS RELIANCE ON POST-BREACH EVIDENCE
The Court of Chancery erroneously looked to post-breach evidence to determine what the parties’ expectations were at the time of the breach seven years earlier. Such.evidence included the award of the BARDA contract in 2011, several years after the breach, despite the reality that BARDA is a government agency that did not come into existence until the day before the breach. The trial court then decided that sales of ST-246 would have begun in 2010, ignoring the undisputed fact that it was first delivered in 2013. ■Further, in the model adopted by the Court of Chancery, the calculation of damages is extremely sensitive to changes in the timing of ST-246 sales.[69]
Uncertainty with respect to the success of the project, the occurrence of contingencies, and the extent of the profits to be gained, if any, were the basis of the Court of Chancery’s 2011 determination that calculating expectation damages was “speculative and too uncertain, contingent, and conjectural.’’[70]. As the Court of Chancery then ruled, the fact of damages was even uncertain: “The evidence adduced at trial proved that numerous uncertainties exist regarding the marketability of ST-246 and that it remains possible that it will- not generate any profits at all.”[71] The following chart illustrates that the trial court’s consideration of post-breach evidence reversed this important conclusion:
[[Image here]]
*1149 contains the reference for footnotes [72], [73], [74] ]•
That the -Court of Chancery came to the opposite conclusion in 2014 suggests that it gave undue weight to evidence of ST-246’s performance in the intervening years. The future performance of ST-246 could not have been known to the parties at the time of breach.
The Majority holds that the Court of Chancery properly “recognized that post-breach evidence could be used ‘in order to aid in its determination of the proper expectations as of the date of the breach,’ but relied on such evidence ‘sparingly,’.”[75] Yet, the chance in 2006 of an event occurring years later is not altered by subsequent knowledge that the event did or did not occur.
Moreover, consideration of post-breach information in the chart below — although this is admittedly “20/20 hindsight” — only illustrates the speculative nature of Phar-mAthene’s claimed expectation damages and highlights the unreliability of crafting an award of damages based on the expectations of parties in cases such as this:
[[Image here]]
*1150 The Court of Chancery recognized in 2011 that expectation damages were likely speculative because the legislation enacting BARDA was less than a day old at the time of breach and “predictive models for regulatory success [were] difficult to come by for ST-246 both because there [were] no other treatments for smallpox to compare it to and very few drugs have been approved under the Animal Efficacy Rule[.]”[82] Also, based upon the trial record, the Court of Chancery in 2011 denied expectation damages as impermissibly speculative in part because “ST-246 might [have] never reeeive[d] FDA approval, there [were] no guaranteed purchasers of ST-246, and research delays or problems in animal trials might [have] prevented] ST-246 from reaching a viable market in a timely fashion[,]”[83] and, as of April 2010, “no final contract with BARDA yet existed.” [84] I believe that the trial court’s reliance on post-breach evidence to resolve uncertainties that it had previously ruled were fatally speculative was error.
III. THE WRONGDOER RULE
The Court of Chancery relied on the so-called “wrongdoer rule” to resolve, or compensate for, uncertainties in establishing damages payable by SIGA. In doing so, the Court of Chancery erroneously used SIGA’s breach of its duty to negotiate a commercial contract in good faith as a basis to relieve PharmAthene of its duty to prove non-speculative damages.
While I agree with the Majority’s conclusion that the fact of damages must be proven with reasonable certainty, I disagree with its holding that the amount of damages does not have to be proven with reasonable certainty. Here, the Majority observes that[85] where the fact of damages has been proven, less certainty is required to establish the amount of damages. It then adds that “where the wrongdoer caused uncertainty about the final economics of the transaction by its failure to negotiate in good faith, willfulness is a relevant factor in deciding the quantum of proof required to establish the damages amount.”[86] Even if mathematical preci *1151 sion is not required to establish the amount of damages and even if reasonable estimates are permissible, I believe the Majority understates the level of certainty required for an award of expectation damages,[87] and then compounds the error by relying on the wrongdoer rule to lessen the burden of proof and sanction an award of speculative damages.
As we said in SIGA I, lost profits damages must be proved with reasonable certainty.[88] “The general rule, followed in Delaware law and elsewhere, is that future lost profits must be established by ‘substantial evidence’ and not by speculation.”[89] Thus, while estimates are permissible, the calculus for such estimates must exclude evidence founded upon speculation or conjecture, and rely, instead, on reasonably certain evidence which enables the factfinder to determine estimated expectancy damages.
Accordingly, I believe that the trial court’s and the Majority’s application of the wrongdoer rule to compensate for the lack of requisite certainty is error. The Majority, for example, relies on Beard Research, Inc. v. Kates[90] for the proposition that if the plaintiff can prove the fact of damages with reasonable certainty, the amount of damages can be an estimate that is not reasonably certain'.[91] Beard Research is distinguishable, in that the case involved misappropriation of trade secrets, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, tor-tious interference with contractual relations, and tortious interference with prospective business relations. That is to say, Beard Research was not a case that centered on a breach of contract, let alone a breach of a preliminary agreement. “Courts have traditionally required greater certainty in the proof of damages for breach of a contract than in the proof of damages for a tort.”[92] In SIGA I, we instructed that the trial court “must look to the contract as the source of. a remedy on the breach of an obligation to negotiate in good faith.”[93] Further, while the Beard Research court observed that “ ‘[t]he quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage[,]’ ”[94] the court’s immediately succeeding qualifier with respect to the required certainty of damages states: “Nevertheless, when acting as the fact finder, [the *1152 Court of Chancery] may not set damages based on mere ‘speculation or conjecture’ where a plaintiff fails to adequately prove damages.”[95]
The Majority relies üpoh Delaware Express Shuttle, Inc. v. Older[96] for the same proposition. Like Beard Research, Delaware Express involved claims of misappropriating trade secrets and breach of fiduciary duties, in addition to claims with respect to breach of a non-competition agreement, defamation, and tortious interference with existing and prospective business relationships. The plaintiff sought injunctive relief as well as damages. The court entered an injunction and awarded damages of “only $6,000.”[97] As in Beard Research, the Court of Chancery acknowledged in Delaware Express that “[t]he law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages.” [98] But, in the immediately succeeding sentence, the court reiterated that “[sjpeculation is an insufficient basis” for an award of damages.”[99] Further, the court rejected the plaintiffs argument that any uncertainties must be resolved against the defendants as wrongdoers.[100]
' This Court’s decision in Duncan v. Theratx, Inc.[101] illustrates that uncertainties not attributed to the wrongdoer in a breach of contract case should be excluded from the damages calculus. There, the defendant’s breach of a merger agreement caused a temporary restriction on the ability of certain stockholders to sell their shares. The uncertainty in calculating damages — “ ‘what the plaintiffs] would have done with [their] securities had they been freely alienable’ ” — was'caused by the breach.[102] The court calculated damages based upon the difference between the “highest intermediate price” achieved while the restriction was in effect and the average price during the period immediately after the restriction was lifted, in order to approximate the effect on share values caused by the restriction. Notably, the court rejected a calculation of damages based on the actual price later obtained for the plaintiffs’ stock — or, for the plaintiffs who retained their shares, the trading price at the time1 of trial — -because such an approach would shift to the defendant the risk of fluctuations in the stock price that were not correlated with the breach. *1153 Thus,' the award in Duncan was tailored to the scope of the injury caused by the breach, and it excluded uncertainties caused by external factors.
Risks of uncertainty concerning future events that are “impossible to know” do not shift to the defendant in a breach of contract case.[103] .Here, the uncertainties that bar expectation damages were caused by neither SIGA nor its breach. Rather, they were the result of the same externalities and third-party decisions that compelled the Court of Chancery to find such damages to be too speculative in 2011. These uncertainties include: (i) whether, when, or how FDA approval would be achieved; (ii) feasibility and cost of manufacturing; (iii) potential toxicities; (iv) whether or when sales would occur and the amount of such sales; and (v) the state of the economy, which has limited government spending on biological threat countermeasures. SIGA’s bad faith conduct does not absolve PharmAthehe of its burden to prove expectation damages with •reasonable certainty. ' !
IV. CONCLUSION ,
SIGA I allowed for the theoretical availability of expectation damages for breach of a preliminary agreement. It added the important qualifier that such damages must be established with reasonable certainty. Such requirement, is presently firmly grounded not'only in New York and California- law, but in Delaware’s as well. In my view, the Majority erodes the “reasonable certainty” requirement by applying a “presumption that doubts about the extent of damages are generally resolved agaiiist the breaching party” to the point of speculation, and then- taking “into account the willfulness of the breach” in a manner that imposes responsibility on SIGA for uncertainties beyond those that it caused.[104] ■ ■
I believe that this Court’s remand instructions in SIGA I were unclear, perhaps prompting the trial court to interpret them in a fashion that essentially ignores the important qualifier regarding the standard of proof.[105] Consequently, it applied the analytical framework borrowed from New York law, without properly accounting for the concomitant limitations on expectation damages, including the requirement that they be established with reasonable certainty. The Majority states that the Dissent’s “main dissatisfaction is with SIGA I and the rulé it adopted permitting the recovery of expectation damages for bad faith breach of Type II agreements.”[106] The Majority is incorrect. I do not believe that SIGA I’s adoption' of New York’s analytical framework with respect to preliminary agreements was error. Rather, I *1154 respectfully suggest that it is the Majority’s application of SIGA I that is problematic for the reasons expressed herein.
I appreciate that the trial court, having fashioned two remedial orders, should not be asked to act again to fashion a third remedial order. Nor should the parties be delayed further in obtaining, a final resolution in this long-running dispute. But. to further push our law in the wrong direction and out of alignment with other major commercial jurisdictions is a more significant error, and. one which has far greater consequences than the impacts felt by the parties in this case alone. I would prefer that this Court accept responsibility for its less-than-clear guidance to the trial court in fashioning a remedial order on remand.
I would vacate this Court’s prior order and remand with an instruction that, based upon this record, expectation damages for breach of this Type II preliminary agreement are “speculative and too uncertain, contingent, and conjectural[,]”[107] and, as a consequence, only reliance damages are available.[108]
For the foregoing reasons, I respectfully DISSENT.

. See SIGA Techs., Inc. v. PharmAthene, Inc., 67 A.3d 330, 351-52 (Del. 2013) (citation omitted) [hereinafter, "SIGA I, 67 A.3d at

. Id. at 351 n. 99.

. Id. (quoting Callahan v. Rafail, 2001 WL 283012, at *1 (Del. Super. Mar. 16, 2001)) (internal quotations omitted).

. PharmAthene I, 2011 WL 4390726, at *37.

. On remand from this Court's opinion in SIGA I, the Court of Chancery granted Phar-mAthene’s motion to reopen the record. See Op. Br. Ex. A. (Tr. 33:21-24). The Court' of Chancery indicated that it “relied:,only sparingly on post-breach information....” PharmAthene, Inc. v. SIGA Techs., Inc., 2014 WL 3974167, at *9 (Del. Ch. Aug. 8, 2014) [hereinafter, “PharmAthene II, 2014 WL 3974167, at-”]. At oral argument before this Court, counsel for PharmAthene confirmed that the only factual difference between the evidence before the Court of Chancery in 2011 and the evidence as supplemented by reopening the record on remand was the existence of a post-breach contract between SIGA and the federal government via the Biomedical Advanced Research and Development Authority (“BAR-DA”). See Videotape: Oral Argument Before the Delaware Supreme Court, at 26:06 (SIGA Techs., Inc. v. PharmAthene, Inc., No. 20, 2015, October 7, 2015), archived at http:// Hvestream.com/DelawareSupremeCourl/ events/4404659/videos/101331469.

. In particular, this Court’s direction to the trial court to reevaluate the helpfulness of expert testimony is not as clear as it- perhaps could have been, as evidenced by the parties’ briefs on appeal. Compare SIGA’s Op. Br. at 29 ("Aqd the Court of Chancery flatly misunderstood the significance of this Court’s invitation to ‘reevaluate the helpfulness of expert testimony.’ That invitation was extended in the context of this Court’s discussion of expert fee-shifting, and was limited to a reexamination of whether expert testimony was helpful in determining a damage award ‘in light of this opinion’ — an opinion that explicitly held that speculative damages cannot be awarded, and left untouched the Court of Chancery’s original finding that expectation damages in this case are speculative.”) (internal citations omitted), with PharmAthene’s Ans. Br. at 26 n.12 (“Rather than affirm the Vice Chancellor’s findings that expectation damages were . too speculative, this Court instead ordered the Vice Chancellor to reconsider his award consistent with the Court’s opinion and, even encouraged him to ‘reevaluate the helpfulness of expert testimony’ in so doing.”) (citation omitted).

. Maj. Op. at 1130 (citations omitted).

. See Schock v. Nash, 732 A.2d 217, 232 (Del. 1999) ("Whether or not an equitable remedy exists or is applied using the' correct standards is an issue of law and reviewed de novo.”) (citations omitted). '

. SIGA I, 67 A.3d at 351 n. 99 (quoting Callahan, 2001 WL 283012, at *1) (internal quotations omitted).

. See, e.g., E, Allan Farnsworth,' Precontrac- - tual Liability 'and Preliminary Agreements: Fair Dealing and Failed Negotiations, 87 Co-lum. L. Rev. 217, 267 (1987) ("[T]he appropriate remedy [for breach of a preliminary agreement] is not damages for the injured party's lost expectation under tire prospective ultimate agreement but damages caused by the injured party's reliance on the agreement to negotiate.”),

. Teachers Ins. Annuity Ass'n of Am. v. Tribune Co., 670 F.Supp. 491, 498 (S.D.N.Y.1987).

. ■ Id.

. Id.

. 884 F.2d 69 (2d Cir. 1989).

. Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 548 (2d Cir. 1998); see also Vacold LLC v, Cerami, 545 F.3d 114, 124 (2d Cir. 2008) (quoting Adjustrite, 145 F.3d at 548).

. Vacold, 545 F.3d at 124 (quoting Shann v. Dunk, 84 F.3d 73, 77 (2d Cir. 1996)) (internal quotations omitted).

. Tribune, 670 F.Supp. at 498.

. Vacold, 545 F.3d at 124 (quoting Adjustrite, 145 F.3d at 548) (internal quotations omitted).

. Id. (quoting Adjustrite, 145 F.3d at 548) (internal quotations omitted).

. Id. (quoting Adjustrite, 145 F.3d at 548) (internal quotations omitted).

. Westerbeke Corp. v. Daihatsu Motor Co., Ltd., 304 F.3d 200, 206 n. 3 (2d Cir. 2002) (quoting Tribune, 670 F.Supp. at 498).

. Vacold, 545 F.3d at 124 (quoting Dunk, 84 F.3d at 77) (internal quotations omitted).

. Brown v. Cara, 420 F.3d 148, 153 (2d Cir. 2005) (quoting Adjustrite, 145 F.3d at 548) (internal quotations omitted) (alterations, in original).'.,

. Westerbeke, 304 F.3d at 206 n. 3 (quoting Tribune, 670 F.Supp. at 498) (internal quotations omitted) (alternations in original).

. Tribune, 670 F.Supp. at 498.

. Vacold, 545 F.3d at 124 (quoting Adjustrite, 145 F.3d at 548) (internal quotations omitted).

. SIGA I, 67 A.3d at 349-51.

. Id. at 350-51.

. Id. at 351 n. 99 (citing Callahan; 2001 WL 283012, at *1 ("It is well-settled law that 'a recovery for lost profits will be allowed only if their loss is capable of being proved, with a reasonable degree of certainty. No recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative.’ ”)).

. See Restatement (Second) of Contracts § 352 (1981) ("Damages are not recoverable for loss beyond an amount that the’ evidence permits to be established with reasonable certainly.”) (emphasis added), ch. 16, topic 2, § 352, cmt. a ("Requirement of pertainty, A party cannot recover damages for breach of a contract for loss beyond the amount, that the evidence permits to be established with reasonable certainty.... The main impact of the requirement of certainty comes in connection with recovery for lost profits.... Although the requirement applies to damages básed on the reliance as well as the expectation interest, there is usually little difficulty in proving the amount that the injured party has actually spent in reliance on the contract, even if it is impossible to prove the amount of profit that he would have made. In such a case, he can recover his loss based on his reliance interest instead of on his expectation interest.”); 5 Corbin on Contracts § 1020 (Rev. ed. 1964) ("In order to be entitled to a verdict, or a judgment, for damages for breach of contract, the plaintiff must lay a basis for a reasonable estimate of the extent of his harm, measured in money. This applies alike to harm that consists in losses suffered by the plaintiff (expenditures and other subtractions from his wealth) and to harm that consists in gains prevented by the breach.”) (emphasis added), § 1022 ("[A] plaintiff who has been injured by a breach of contract frequently has a right to damages much greater in amount than the mere net profit that-would have resulted from full performance; but such profits, when their amount and the fact that they have been prevented by the breach of the defendant can be proved with reasonable certainty, always form one of the elements in the damages that can be recovered.”) (emphasis added); MODERN LAW OF CONTRACTS § 14:14 (2015) (“Although the value of lost profits and other consequential damages do not have to be proven with precision, the proof must be solid enough to justify a" reasonable approximation by the trier of fact. Thus, rules of certainty and foreseeability apply both to proof of damage and to fact of damage.”) (emphasis added), § 14:6 ("Proving breach is not enough to recover damages. There also must be proof of actual damages that fldw from the breach.... There must be evidence of associated costs from which a finder of fact can determine the actual net loss — or’ a close approximation thereof — that resulted from the breach. Mathematical certainty is not required. 'Reasonable’ certainty, which may be based upon probabilities and inferences, will suffice.”) (citations omitted).

. See Goodstein Constr. Corp. v. City of N.Y., 80 N.Y.2d 366,590 N.Y.S.2d 425, 604 N.E.2d 1356, 1360-62 (1992); see also 180 Water St. Assocs., L.P. v. Lehman Bros. Holdings, Inc., 7 A.D.3d 316, 317, 776 N.Y.S.2d 278 (2004) (citing Goodstein, 590 N.Y.S.2d 425, 604 N.E.2d at 1360-61) (noting that a plaintiff claiming breach of an agreement to negotiate in good faith was limited to damages for out. of pocket losses).

. Goodstein, 590 N.Y.S.2d 425, 604 N.E.2d at 1359-60.

. The Goodstein Court noted that the conclusion of a final agreement was far from certain because the City of New York had the ability to terminate the preliminary agreement. Id., 590 N.Y.S.2d 425, 604 N.E.2d at 1361. Here, by contrast, the Court of Chancery found that the LATS would have matured into a final agreement but for SIGA's breach. PharmAthene I, 2011 WL 4390726, at *38. Nevertheless, as discussed below, other factors present here contribute to the speculative nature’ of PharmAthene’s asserted profits, including the revenue-based economic terms of the LATS. PharmAthene II, 2014 WL 3974167, at *4 n. 20; see A352-53. Further, Goodstein involved the development of real property, the object of the LATS was to research, test, and market a new drug — an undertaking that embraces greater business risk and uncertainty.

. Goodstein, 590 N.Y.S.2d 425, 604 N.E.2d at 1361 (internal quotations omitted) (citations omitted).

. L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d, 419, 431 (2d Cir. 2011). (citing Goodstein, 590 N.Y.S.2d 425, 604 N.E.2d at 1361) (citation omitted).

. 427 F.Supp.2d 463 (S.D.N.Y. 2006), aff'd, 264 Fed.Appx. 36 (2d Cir. 2008).

. Id. at 478, 485.

. Id. at 487.

. 791 F.Supp. 401 (S.D.N.Y. 1991).

. Id. at 414-15.

. Id. at 415.

. Id. at 416.

. PharmAthene II, 2014 WL 3974167, at *4 n. 20; see A352-53.

. See, e.g., Bulldog N.Y. LLC v. Pepsico, Inc., 8 F.Supp.3d Í52, 175 (D. Conn. 2014) ("In situations where a defendant has breached a Type II [agreement by failing to negotiate in *1145 good faith,- ‘lost profits are generally not available where no agreement is reached, [but] out-of-pocket costs may still be appropriate.' ... The only damages [that the plaintiff] appears to claim relate to its expected profits ... which are unavailable for breach of a Type II agreement.”) (citation omitted) (alterations in original and added) (applying New York law); Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc., 765 F.Supp.2d 403, 417 (S.D.N.Y. 2011) ("Although it is true that lost profits are generally not available where no agreement is reached, out-óf-pocket costs may still be appropriate.”) (citations omitted); Fairbrook Leasing, Inc. v. Mesaba Aviation, Inc., 519 F.3d 421, 429-30 (8th Cir. 2008) ("This is a difficult, largely unsettled question of remedies.... [But] we have no difficulty affirming the district court’s decision that expectancy damages may not be recovered in this case_ The same reasoning [that applied in Goodstein -for denying expectation damages] applies in this case. The Term Sheet was silent on significant issues_The parties were not obligated to agree on these issues, nor can the missing terms be judicially determined by objective criteria in the Term Sheet itself or in commercial practice, usage, or custom. In effect, [the appellant] asks us to do .what New York law prohibits — transform a binding preliminary agreement to negotiate for a contract into the contract itself.”) (applying New York law). Cf. Worldwide Servs., Ltd. v. Bombardier Aerospace Corp., 2015 WL 5671724, at *20 (S.D.N.Y. Sept. 22, 2015) (“The Court recognizes that the Second Circuit has explained that although out-of-pocket costs incurred in the course of good faith partial performance are appropriate, lost profits are not available where no agreement is reached.") (citing L-7 Designs; 647 F.3d at 431).

. 647 F.3d 419 (2d Cir. 2011).

. Id. at 430 (quoting Tribune, 670 F.Supp. at 498).

. Id. at 431 (citing Goodstein, 604 N.E.2d at 1361) (citation omitted). See also ICBC (London) PLC v. Blacksands Pac. Grp., Inc., 2015 WL 5710947, at *9 n. 94 (S.D.N.Y. Sept. 29, 2015), notice of appeal filed, Oct. 23, 2015 (No. 15-3387) (citing L-7 Designs, 647 F.3d at 431) (observing that .‘‘lost profits are not available as a remedy for [breach of a Type II preliminary agreement]; recovery is limited to out-of-pocket costs incurred in partial performance of good faith negotiations”).

. See, e.g., Advanced Thermal Scis. Corp. v. Applied Materials, Inc., 2010 WL 2015236, at *52 (C.D.Cal. May 18, 2010) (discussing the uncertainty of lost profits damages and awarding reliance damages); In re ECC Sys., Inc., 323 Fed.Appx, 519, 521 (9th Cir.2009) (denying expectation damages in view of the fact that they were “not the reliance damages that under California law as set forth in [Copeland v. Baskin Robbins U.S.A.] are the only, damages available for breach of a contract to negotiate an agreement”) (emphasis added); Original S.F. Toymakers, Inc. v. Trendmasters, Inc., 2003 WL 22384771, at *7 (N.D. Cal. Oct. 7, 2003) (“The appropriate remedy for a breach of an agreement to negotiate are those damages which the plaintiff incurred in reliance on the defendant to negotiate in accordance with the covenant of good faith and fair dealing implied in every contract. This measure includes the ‘plaintiff’s out of pocket costs in conducting the negotiations’ but may not include ‘lost expectations (profits).’ ”) (internal citations omitted); Vestar Dev. II, LLC v. Gen. Dynamics Corp., 249 F.3d 958, 962 (9th Cir. 2001) (affirming the denial of expectation damages in connection. with a preliminary *1146 agreement on the grounds that any such award would require "impermissible-speculation”).

. 96 Cal.App.4th 1251, 117 Cal.Rptr.2d 875 (2002).

. Id. at 877.

. Id.

. Id. at 878.

. Id.

. Id. at 880.

.Id. at 883 (citation omitted).

. Id. at 885 (citations omitted). Notably, in PharmAthene I, the trial court found that “the parties did not intend the LATS as attached to [the Bridge Loan Agreement and Merger Agreement] to be a binding license agreement or to require that any later formal agreement include exactly the same terms as the LATS.” PharmAthene I, 2011 WL 4390726, at *16. But, on remand, the trial court observed that this Court’s opinion in SIGA I "place[d] greater weight on the terms specified in the LATS than [it] afforded those terms in determining [the] prior damages award.” PharmAthene II, 2014 WL 3974167, at *4.

. See, e.g., PharmaNetics, Inc. v. Aventis Pharms., Inc., 2005 WL 6000369, at *12, *16 (E.D.N.C. May 4, 2005), aff’d, 182 Fed.Appx. 267 (4th Cir. 2006) (affirming exclusion of *1147 expert testimony and noting that there was "no clear error in ruling the new technology’s lost sales to be too speculative”).

. 432 F.Supp.2d 1319 (S.D. Fla. 2006), aff'd, 294 Fed.Appx. 501 (11th Cir. 2008).

. id. at 1345 (internal citation omitted). See also Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000) (explaining that under New York law, "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate”) (citing Kenford Co., Inc. v. Erie Cnty., 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234, 235 (1986)).

. Id. at 1346. In AlphaMed, the plaintiff failed to prove the fact of damages, i.e., that it would have earned a profit (of any amount) but for the defendant’s conduct.

. 172 F.Supp.2d 680 (D. Md. 2000), aff'd, 11 Fed.Appx. 279 (4th Cir. 2001).

. Id. at 698.

. Id. at 699.

. See Stewart v. Wilmington Trust SP Servs., Inc., 2015 WL 6672222, at *2 (Del. Nov. 2, 2015) (discussing the beneficial impact of synchronizing laws of "sister states, such as New York, whose laws are often involved in situations involving Delaware corporations”). Harmonizing the laws of sister states is useful where, as here, we adopt a portion of the sister state’s law as our own.

. SIGA I, 67 A.3d at 348.

. A147 (Bridge Loan Agreement § 7.11).

. A273 (Merger Agreement § 13.5).

.In 2011, by contrast, the trial court had found that ”[t]he disparity of outcomes be- '• tween, on the one hand, the Basis I and 2009 Basis II models and, on the other hand, the 2010 Basis II model highlights the inherently speculative nature of Baliban’s damages calculations.” PharmAthene 1, 2011 WL 4390726, at *37 n. 224 (‘‘With the benefit of slightly more current information, PharmAth-ene’s estimated damages diminished by over $600 million, or more than 50%.”). The trial court, specifically, had found Baliban’s analysis to be too speculative due to its sensitivity to the timing of sales. See id. (”[W]ere sales to commence one year later than assumed ... the ultimate damages amount would decrease by over $90 million, a decrease of over 20%.’’).

.Id. at *37.

.Id.

. Id.

. PharmAthene II. 2014 WL 3974167, at *6.

. Id. (citation omitted).

. Maj. Op. at 1133 (citing PharmAthene II, 2014 WL 3974167, at *9).

. PharmAthene, Inc. v. SIGA Techs., Inc., 2010 WL 4813553, at *11 n. 64 (Del.Ch. Nov. 23, 2010).

. PharmAthene I, 2011 WL 4390726, at *31.

. Id. at *37 n. 224.

. See Cole v. Homier Distrih. Co., Inc., 599 F.3d 856, 864 (8th Cir. 2010) (“[A] plaintiff in a contract action generally has the burden of proving 'the existence and amount of ... damages with reasonable certainty.”) (citation omitted) (emphasis added); Schonfeld, 218 F.3d at 172 ("In an action for breach of contract, a plaintiff is entitled to recover lost profits only if he can establish both the existence and amount of such damages with reasonable certainty....") (citing Kenford Co., 502 N.Y.S.2d 131, 493 N.E.2d at 235) (emphasis added); Summit Props. Int’l, LLC v. Ladies Prof'l Golf Ass’n, 2010 WL 2382405, at *2 (S.D.N.Y. June 14, 2010) ("In order to recover loss of future profits as damages for breach of contract under New York law, the plaintiff must establish the existence and the amount of lost profits with reasonable certainty....") (citing Schonfeld, 218 F.3d at 173) (emphasis added); Am. Commc'ns Network, Inc. v. Steuben Assocs., 2005 WL 1355070 (E.D. Mich. Apr. 5, 2005) ("In general, damages must be proved by the plaintiff by establishing both the existence and amount of such damages with reasonable certainty.") (citation omitted).

.Maj. Op. at 1131 (collecting cases).

. See 5 Corbin on Contracts § 1022 (Rev. ed. 1964) (“[T]he term ‘speculative and uncertain profits’ is not really a classification of profits, but is instead a characterization of the evidence that is introduced to prove that they would have been made if the defendant had not committed a breach of contract. The law .requires that this evidence shall not be so meager or uncertain as to afford no reasonable basis for inference.... ”).

. SIGA I, 67 A.3d at 351 n. 99. See also Chrysler Corp. v. Quimby, 144 A.2d 123, 139 (Del. 1958).

. Agilent Techs., Inc. v. Kirkland, 2010 WL 610725, at *29 n.271 (Del. Ch. Feb. 18, 2010) (quoting Mobile Diagnostics, Inc. v. Lindell Radiology, P.A., 1985 WL 189018, at *4 (Del. Super. July 29, 1985) ("The general rule is that loss of future profits must be established by substantial evidence and can’t be left to speculation.”); Re v. Gannett Co., Inc., 480 A.2d 662, 668 (Del. Super. 1984), aff'd, 496 A.2d 553 (Del. 1985) ("Courts have required that loss of: future profits be established by substantial evidence and not be left to speculation.”) (internal citations omitted)).

. Beard Research, Inc. v. Kates, 8 A.3d 573 (Del. Ch. 2010), aff'd sub. nom., ASDI, Inc. v. Beard Research, Inc., 11 A.3d 749 (Del. 2010).

. Maj. Op.-at 1111, 1122, 1131,' 1131.

. Restatement (Second) of Contracts ch. 16, topic 2, § 352, cmt. a (1981).

. SIGA I, 67 A.3d at 348.

. Beard Research, 8 A.3d at 613 (citation omitted) (alteration in original).

. Id. (quoting Medek v. Medek, 2009 WL 2005365, at *12 n. 78 (Del.Ch. July 1, 2009)). The Majority also cites to 24 Wiiziston on Contracts § 64:9 (4th ed. 2000) for the proposition that "it is now well established that the uncertainty that prevents recovery is uncertainty as to the fact of damage and not as to its amount.” Williston’s immediately succeeding qualifying language, however, provides: "In other words, where substantial damage has been suffered, the impossibility of proving its precise amount provides no basis for denying the recovery of substantial damages altogether.” Id. (citations omitted). Indeed, damages need not be denied merely because the plaintiff cannot establish their exact amount, but that is not to say, as the Majority suggests, that damages may be awarded based on speculative estimations.

. 2002 WL 31458243 (Del. Ch. Oct. 23, 2002).

. Id. at *1.

. Id. at *15 (internal quotations omitted) (citation omitted).

. Id. (internal quotations omitted) (citation omitted).

. Id. at *15 n. 88.

. 775 A.2d 1019 (Del. 2001).

. Id. at 1023 (quoting Am. Gen. Corp. v. Cont’l Airlines Corp., 622 A.2d 1, 10 (Del. Ch. 1992)).

. See id. at 1023-24 (citing Madison Fund, Inc. v. Charter Co., 427 F.Supp. 597, 608 (S.D.N.Y. 1977)).

. Maj. Op. at 1131.

. The- Majority Opinion suggests that the remand .instructions were clear because they instructed the trial court to “determine anew whether expectation • damages should ’be awarded” and to "reconsider the helpfulness of expert testimony directed to expectation damages.” Id. at 1138. But the trial court, perhaps understandably,- appears to have interpreted the -instructions as a hint that this Court believed that expectation damages were likely available. Yet, this Court, in SIGA-1, expressly stated that it was not reaching the question of whether such an award "would be too speculative.” SIGA I, 67 A.3d at 353. Since we made clear in footnote 99 of SIGA I that an award of expectation damages "presupposes that the plaintiff can prove damages with reasonable certainty,” the: remand instructions, to ‘ the extent they suggested' that an award of expectation damages would likely be available, are inconsistent with SIGA I’s recognized need to reach the issue of speculation first — which this Court expressly did not do. Id. at 351 n. 99.

.Maj. Op. at 1138.

. PharmAthene I, 2011 WL 4390726, at*37 (citing PharmAthene, Inc. v. SIGA Techs., Inc., 2010 WL 4813553, at *11 (Del. Ch. Nov. 23, 2010)).

. The Majority states that the Court of Chancery found that reliance damages "would be no remedy at all for SIGA’s bad faith breach.” Maj. -Op. at 1138 (citation omitted). In fact, the trial court stated that, “[bjased on the evidence presented at trial ... reliance damages here appear to be in the range of only about $200,000, a nominal sum relative to PharmAthene’s claimed damages of hundreds of millions of dollars.” PharmAthene II, 2014 WL 3974167, at *6 n. 29. SIGA maintains that PharmAthene made a strategic decision not to proffer any evidence of reliance damages at trial. The record reflects that, on remand, PharmAthene predominantly sought lump sum expectation damages as relief. Compare PharmAthene's PreTrial Br. on Remand at B638 (urging that PharmAthene is entitled to its "expectation and not simply its reliance interest”), with PharmAthene’s Post-Hearing Response Br. at B715 (same), and SIGA’s Op. Br. on Remand ■at A817 (“If the only reliance damages in the record are de minimis (SIGA contends they are not), it is the consequence of a strategy PharmAthene adopted in an effort to press the Court [of Chancery] to make an inappropriately larger award.”). The Majority also claims SIGA is "poorly positioned” to argue that the parties’ expectations at the "time of breach were too speculative. Maj. Op. at 1137. As support, it points to SIGA’s internal valuations of ST-246, which ranged from $3 billion to $5 billion, Id. Yet, its affirmance of a lump sum award of $113 million undercuts the credibility of those valuations as a tool to appropriately measure damages.